ZENITH SPORTSWEAR CO. INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56288. Filed May 27, 1957.

*Monroe J. Winsten, Esq.,* for the petitioner.
*Charles M. Greenspan, Esq.,* for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax for the taxable years ended February 28, 1947, and February 29, 1948, in the amounts of $11,082.88 and $5,035.94, respectively. Petitioner contests the deficiencies and for the year 1947 claims a refund.

Several minor issues were settled by oral stipulation and effect will be given thereto under Rule 50. One issue was waived by petitioner. The two issues remaining are: (1) Whether petitioner is entitled to deduct from its gross income for the taxable years ended February 28, 1947, and February 29, 1948, the amounts of $12,500 and $27,500, respectively, as representing amortization of a payment of $40,000 to Albala on September 25, 1946, in connection with transfer of his one-half interest in a leasehold; and (2) whether petitioner is entitled to deduct from its gross income for the taxable year ended February 28, 1947, an amount of $15,000 as salary allegedly paid to Albala on September 25, 1946.

### FINDINGS OF FACT.

Petitioner is a corporation. It was incorporated on March 1, 1946, under the laws of the State of New York. It filed its Federal income tax returns for the years in question with the then collector of internal revenue for the third district of New York.

On or about December 5, 1941, Joseph D. Barouch and Meyer Albala became engaged in the business of manufacturing women's sportswear as co-partners, doing business under the firm name and style of Zenith Sportswear Co., hereinafter referred to as the partnership.

On February 1, 1942, the partnership first occupied 7,500 square feet on the sixth floor of the building located at 254–258 West 35th Street in the Borough of Manhattan, New York, New York, for the conduct of its business under a written lease, hereinafter referred to as the lease, for a term of 2 years at an annual rental of $5,000.

On September 8, 1943, the lease was extended for the 2-year period beginning February 1, 1944, and ending January 31, 1946, at an annual rental of $5,500 for the first year and $5,750 for the second year.

On October 22, 1945, the parties to the lease agreed in writing that the reasonable rental for the space so occupied by the partnership was $6,500 per annum, payable monthly in advance on the first day of each month.

Later, the lease was again extended for the 2-year period beginning February 1, 1946, and ending January 31, 1948, at an annual rental of $6,500.

The lease expressly permitted "the Tenant to sublet or assign this lease to a corporation to be organized by the Tenant, provided Tenants

continue to remain liable" for the payment of the rent and the performance of all the terms of the lease.

At the time petitioner was incorporated on March 1, 1946, it took over the business then being conducted by the partnership. All the assets of the partnership were assigned to petitioner except the lease. The latter remained in the names of the two partners, Barouch and Albala. Petitioner, in taking over the business of the partnership, conducted the business on the same premises occupied by the partnership and paid the monthly rental called for in the lease. Petitioner was capitalized at $50,000 and each of the partners subscribed for one-half of the capital stock, each receiving 250 shares thereof, having a par value of $100 per share. On or about February 8, 1946, an agreement was executed by petitioner, Barouch, and Albala, parties of the first, second, and third parts, respectively, setting forth and confirming the terms of the understanding of Barouch, and Albala as to the management and affairs of the corporation, their rights therein and their relations with each other. The second paragraph of the agreement provided for the employment by petitioner of Barouch and Albala "providing" that they continue as stockholders of petitioner at such salaries as may be agreed upon and payable "at such times as the Board of Directors from time to time may agree upon."

On February 28, 1946, the partnership ceased business operations, and thereafter petitioner continued the business formerly conducted by the partnership.

In August 1946, a disagreement arose between Barouch and Albala, as a result of which it was decided that either Barouch or Albala would retire from petitioner. In order to effectuate their decision to separate, both parties instructed their mutual attorney, Julius Riedler, to prepare the necessary papers. Riedler prepared a three-party, written agreement between petitioner as first party, Barouch as second party, and Albala as third party, setting the pattern and method by which the separation was to be accomplished. This agreement was signed by the parties on August 6, 1946, and witnessed by Riedler and Isidor Feldman, who was the accountant for the parties. The agreement provided, among other things, that on or before September 24, 1946, a financial report would be prepared by the accountant and delivered to the principals showing the net worth of petitioner. It also provided that, after the receipt of such report, Barouch and Albala were to meet on September 25, 1946, in the presence of Feldman and Riedler and were to submit progressive bids (of no less than $1,000 at a time)—

or prices at which they are willing to sell to the "corporation" their stockholdings, all their title and interest in the machinery and other property if any owned by the said individuals and now in the loft occupied and used by the "corporation." and all their rights and interest in and to the lease of the loft now occupied by the "corporation" but in the names of "Barouch" and "Albala."

The agreement also provided that "[t]he higher bid shall determine the value of the corporate stock to be purchased by the 'corporation' from the lower bidder" and that "[t]he parties agree to be bound by this method of ascertaining the value of the stock and that the lower bidder will sell the stock to the corporation at the price determined by the higher bid as aforesaid."

The Sixth and Seventh paragraphs of the agreement further provided:

SIXTH: It is understood among all three parties hereto that the balance sheet as prepared by the accountants, represents the actual transferrable [sic] net worth of the "corporation" and that all bids include such net worth.

SEVENTH: It is further understood between the corporation, "Barouch" and "Albala" that whatever amount is paid to either one by the "corporation" for the price of his capital stock, and which amount is in excess of the net worth of his respective stockholdings as shown by the balance sheet, that such excess is being paid by the "corporation" for the seller's interest in the lease of the loft occupied by the "corporation."

The August agreement further provided that simultaneously with the signing of this agreement various documents signed by each of the principals were deposited in escrow with Riedler, to be held by him subject to the outcome of the bidding, which documents included resignations, releases, assignments of the interest of each of the individuals in the leasehold and shares of stock and corporate checks of petitioner, signed in blank by Barouch and Albala as officers of the petitioner; that Riedler, as escrow agent, was given authority at the conclusion of the bidding to insert, as payee, the name of the unsuccessful bidder on two checks, and on one check to insert the amount of the book value of the stock of the unsuccessful bidder, and on the other check to insert the amount to be paid for his interest in the leasehold as determined by the competitive bidding.

Feldman's office prepared a statement of the net worth of petitioner's business as of September 21, 1946, in connection with the termination of Barouch's and Albala's relationship and found it to be the amount of $139,008.44, as representing the difference between the total assets of $208,782.43 and total liabilities of $69,773.99. In preparing the statement of petitioner's net worth in 1946, Feldman made no efforts to ascertain the amount of the goodwill of petitioner. The February 8, 1946, agreement had contained a provision for determining the net worth of petitioner and had in this connection provided that "[i]n determining the assets of the corporation, the name and good-will of the same shall be valued at one dollar."

During the year 1946, the petitioner did business with, and enjoyed an advantageous business relationship with, such customers as Montgomery Ward, W. T. Grant and Company, Jordan Marsh and Company, and Lerner stores. Petitioner had spent substantial sums prior

to and during 1946 to preserve and develop this advantageous relationship. Petitioner's expenditures were made with a view to developing and maintaining the goodwill of its business and in 1946 the petitioner possessed a valuable goodwill.

On September 25, 1946, Barouch, Albala, Riedler, and Feldman met at petitioner's office for the purpose of conducting the business as provided for in the agreement of August 6, 1946. It was then agreed that the value of the shares of stock held by Barouch and Albala should each be one-half of $139,008.44, or $69,504.22; and that the competitive bidding to be conducted would relate to the interest of the retiring stockholder in the leasehold. The bidding allegedly for the leasehold on behalf of the corporation was commenced by Albala at $9,000 after the flip of a coin. The bidding continued progressively until $40,000 was bid on behalf of petitioner by Barouch, which was the highest bid allegedly made for the interest of the retiring stockholder in the leasehold.

Upon conclusion of the bidding, Riedler, as escrow agent, then completed the two above-mentioned corporate checks held by him in escrow by filling in the name of Albala as payee on each of them and by inserting the amount of $40,000 on one check and the sum of $69,504.22 on the other check. At the same time there was delivered to petitioner documents assigning to petitioner, Albala's 250 shares of stock and his interest in the lease. Albala then withdrew from petitioner and went to California.

In September 1946 when Albala retired from petitioner, petitioner was conducting a highly successful and profitable business. Its gross volume for that fiscal year was $683,658.78 and the net income reported by petitioner on its return was $126,505.76.

In September 1946 when Albala assigned his interest in the lease to petitioner, the unexpired term of the lease was 16 months.

In September 1946 there was no loft space available for rent in the garment district of New York City and, as a result of this unique condition, all efforts to obtain space similar to that covered by the leasehold were unsuccessful.

The sum of $40,000 allegedly paid by petitioner to Albala on September 25, 1946, for his interest in the lease was amortized by petitioner on the basis of the 16 months remaining of the term of the lease at the time of its purchase by petitioner. This resulted in a deduction of $12,500 claimed by petitioner for the taxable year ending February 28, 1947, and $27,500 for the taxable year ending February 29, 1948, both of which claimed deductions were disallowed by respondent in the statutory notice of deficiency.

A reasonable allocation of the total consideration paid by petitioner for the stock and leasehold interests of Albala is $106,504.22 for the stock and $3,000 for the leasehold.

Petitioner did not pay to Albala or accrue on its books or claim as a deduction on its return any salary for Albala for its taxable year ended February 28, 1947. Neither were there any amounts withheld for income tax on account of any salary to Albala for that year.

On or about March 25, 1953, petitioner filed a claim for refund on Form 843 for the taxable year ended February 28, 1947, in which it claimed that it should have deducted from its gross income for that year an amount of $15,000 as "representing the salary of Meyer Albala for the corporation's fiscal period of 3–1–46 to 9–30–46."

OPINION.

Petitioner contends that it made a bona fide purchase of Albala's interest in the lease here in question for a consideration of $40,000 and that it is entitled under section 23 (a) (1) (A) [1] of the Internal Revenue Code of 1939 and section 29.23 (a)–10 [2] of Regulations 111 to amortize such cost as a deductible business expense over the 16 months remaining of the lease term.

The respondent contends that in effect no amount was paid by petitioner for Albala's interest in the lease on the ground that the $40,000 paid by petitioner to Albala should be considered as an additional amount paid by petitioner for Albala's stock interest in petitioner. In other words, the substance of the respondent's contention is that Feldman, in making up his September 1946 statement showing the net worth of petitioner to be $139,008.44, in effect erred in not including among the assets any amount for goodwill and that if goodwill to the extent of $80,000 had been included, the net worth would have amounted to $219,008.44, one-half of which would have equaled the two checks received by Albala from petitioner on September 25, 1946.

We think there is much to be said for the respondent's contention. However, the fact remains that at the time petitioner was organized, the two stockholders, Barouch and Albala, did not transfer to the

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *

[2] Regs. 111:

SEC. 29.23 (a)–10. RENTALS.—If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run. * * * As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease or the cost of improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal. * * *

petitioner corporation their interests in the leasehold and, at the time of Albala's withdrawal, petitioner did pay Albala a total of $109,504.22 for his stock and his one-half interest in the leasehold. Due to the relatively large amount of business petitioner was doing, the annual rental provided for in the lease, and the relatively short period the lease had to run at the time the disagreement arose, we think the amount of $40,000 paid by petitioner to Albala ostensibly for his one-half interest in the leasehold is unrealistic and not in accordance with the substance of the transaction. We think the sale of the stock and the sale of the one-half interest in the leasehold "must be treated as parts or steps in a single transaction." Cf. *R. M. Gunn*, 25 T. C. 424, affirmed per curiam sub nom. *Perrault* v. *Commissioner*, 244 F. 2d 408 (C. A. 10, 1957). So treated, we think the total consideration must be considered as having been paid primarily for Albala's stock interest in petitioner and only a very small portion for his interest in the leasehold. Petitioner's business was very profitable which, in our opinion, would plainly make its stock worth considerably more than the net book value of its tangible assets which the accountant found to be $139,008.44 as representing the net worth of petitioner's business. No value for goodwill was included by the accountant in arriving at this net worth figure. We think the evidence shows that petitioner possessed a valuable goodwill and we have so found as a fact. At the time the disagreement between the stockholders arose, the lease had only 16 months more to run at an annual rental of $6,500. The parties to the lease on October 22, 1945, had agreed in writing that the $6,500 per annum constituted a "reasonable rental" for the leased premises. When all of these circumstances, namely, the prosperity of the business, the annual rental provided for in the lease, the relatively short period the lease had yet to run, are viewed together, it seems obvious that Albala's one-half interest in the lease was not worth the $40,000, ostensibly paid for it by petitioner. Furthermore, under the terms of the lease, petitioner is the only party Albala could transfer his interest in the lease to without obtaining the consent of the landlord. For all of these reasons, we think a reasonable allocation of the total amount paid by petitioner for the stock and for interest in the leasehold is as set out in our findings. *Cohan* v. *Commissioner*, 39 F. 2d 540. We hold that the amount so allocated to the leasehold is deductible by petitioner on the basis of five-sixteenths in the taxable year ended February 28, 1947, and eleven-sixteenths in the taxable year ended February 29, 1948. Sec. 23 (a) (1) (A), *supra*, and sec. 29.23 (a)–10, Regs. 111.

We see no merit in the second issue which was raised by petitioner in its claim for refund. The parties never intended such a salary payment to Albala. It was never accrued on the books of petitioner.

It was never paid to Albala as salary. It was not deducted in petitioner's tax return. We hold the respondent was correct in denying the claim.

*Decision will be entered under Rule 50.*